OPINION
{¶ 1} Katrina Ross appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which awarded visitation with the child for whom she is the legal custodian, Logan Haywood, to her former husband, Neal Boggs.
 {¶ 2} Logan was born to Jessica Whitehead, who is Ross's niece, in January 2001. Because Whitehead was incarcerated at the Department of Youth Services when Logan was born, Logan went to live with Ross and Boggs. At that point, Ross and Boggs had been married for almost ten years. Ross was appointed to serve as Logan's custodian.
 {¶ 3} By most accounts, Boggs was a father figure to Logan, participated in his care, and formed a healthy bond with him. However, Boggs filed for a divorce from Ross in April 2003 after discovering that she was having an affair. Logan's custody was not at issue during the divorce proceedings, and neither visitation with Boggs nor child support was addressed. The divorce was finalized in October 2003.
 {¶ 4} Beginning in early 2004, Ross apparently refused to grant Boggs's requests to visit with Logan unless he agreed to pay child support. On July 30, 2004, Boggs filed a motion for visitation in the juvenile court. The trial court entered an interim order of visitation of two hours per week, and it conducted a hearing on February 11, 2005. Following the hearing, the court awarded Boggs the standard order of visitation but without the mid-week visit.
 {¶ 5} Ross raises one assignment of error on appeal.
 {¶ 6} "THE TRIAL COURT ERRED BY GRANTING APPELLEE THE STANDARD ORDER OF VISITATION WITH THE MINOR CHILD, LOGAN HAYWOOD, AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 7} Ross claims that the juvenile court did not sufficiently weigh the statutory factors for determination of visitation and that the order of visitation was not in Logan's best interest.
 {¶ 8} She relies on R.C. 3109.051, which sets forth the circumstances in which a court may grant companionship or visitation rights to a non-parent in a divorce, dissolution of marriage, or legal separation that involves a child or in a child support proceeding. Specifically, she argues that the court did not give appropriate weight to Logan's age, to her wishes as his custodian, and to the effect that Logan's visitation with Boggs would have on the dynamics of the rest of the family, including the amount of time that Logan would be able to spend with Ross, her husband, and another child in their household. See R.C.3109.051(D)(3), (4), (5), (8), and (15).
 {¶ 9} Initially, we note that this matter came before the court as a juvenile proceeding, not a domestic relations matter. As such, the court was not required to consider the factors set forth at R.C. 3109.051(D), as Ross suggests. The language of that statute specifically states that it applies in a divorce, dissolution of marriage, legal separation, or child support proceeding that involves a child. R.C. 3109.051(B). This proceeding did not fall into any of those categories. Moreover, Ross is not a "parent" as contemplated by the domestic relations statutes.
 {¶ 10} The juvenile court determined that it had jurisdiction over the visitation question because Logan had been adjudicated in that court before and because Ross was not his parent. We agree. R.C. 2151.417(A) empowers the juvenile court to "review at any time the [adjudicated] child's placement or custody arrangement" and to compel the child's custodian to "take any reasonable action that the court determines is necessary and in the best interest of the child." Further, the court conducted a best interest analysis in determining whether visitation with Boggs was appropriate, rather than addressing specific statutory criteria set forth at R.C. 3109.051(B) or elsewhere. Based on R.C. 2151.417(A), this best interest analysis was entirely appropriate. Thus, we turn to whether the evidence presented at the hearing supported the trial court's determination that visitation with Boggs was in Logan's best interest.
 {¶ 11} Boggs testified extensively about his relationship with and love for Logan and how he and Ross had shared responsibilities for the child during their marriage. He stated that Logan had called him "Daddy" while they had been living together. He further testified that Logan is "pretty excited and high strung" when they get to visit together, and he described the types of things Logan does when they are together. He expressed a willingness to help financially with Logan insofar as he is able but stated that his funds had been stretched by the initial costs associated with setting up his own household. He also stated that he had set up a college savings fund for Logan. Boggs testified that he had a bedroom at his home for Logan and was prepared to buy others things that Logan would need if he had regular visitation, such as clothes. Boggs admitted to some marijuana use in the past but stated that he had not used the drug for a couple of years. This testimony was corroborated by other witnesses.
 {¶ 12} Numerous other people also testified about Logan's relationship with Boggs. Several witnesses, including two of Ross's witnesses, acknowledged that Logan had called Boggs "Dad" or a similar name while they had been living together and described a very good relationship between them. These witnesses included Logan's babysitter and a neighbor. Indeed, Ross's brother and his long-time girlfriend, who had babysat Logan extensively, acknowledge that Boggs and Logan were bonded and displayed appropriate interaction. They also indicated that they would have no concerns about Logan spending unsupervised time with Boggs.
 {¶ 13} Ross and her new husband, Robert, testified that Robert was Logan's father figure now and that Logan's regular visitation with Boggs "disrupts things." Ross stated that Boggs had shown little interest in Logan when they were living together and that she questioned his motivation. Although she acknowledged that there had been no significant problems with the interim visitation, Ross did suggest that Boggs had taught Logan inappropriate things, such as how to use a car lighter, when they had been together.
 {¶ 14} The guardian ad litem expressed the view that it was in Logan's best interest to visit with Boggs because they were "bonded" and had a loving relationship. She also expressed her belief that Boggs was "altogether sincere in his wish" to be a part of Logan's life. Accordingly, the guardian ad litem recommended that Boggs be granted visitation that would ultimately reflect the standard order of visitation.
 {¶ 15} In light of the evidence presented and the recommendation of the guardian ad litem, the juvenile court reasonably concluded that visitation with Boggs was in Logan's best interest. Moreover, the court reasonably rejected Ross's claim in her objection to the magistrate's report and recommendation that the amount of visitation awarded to Boggs was so excessive as to unduly interfere with her family life. In light of the court's findings that Ross frequently works on weekends and that Boggs and Logan had a close relationship, we are unpersuaded that the visitation was excessive.
 {¶ 16} The assignment of error is overruled.
 {¶ 17} The judgment of the trial court will be affirmed.
Grady, P.J. and Donovan, J., concur.